**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD (SBN 149343)
*tblood@bholaw.com*
THOMAS J. O'REARDON II (SBN 247952)
*toreardon@bholaw.com*
JAMES M. DAVIS (SBN 301636)
*jdavis@bholaw.com*
501 West Broadway, Suite 1490
San Diego, CA 92101
Phone: (619) 338-1100

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRY YEH and G.Y., a minor by and through his guardian Henry Yeh, on behalf of themselves, all others similarly situated, and the general public,<br><br>                    Plaintiffs,<br><br>          v.<br><br>TESLA, INC.,<br><br>                    Defendant. | Case No: 3:23-cv-01704-JCS<br><br><u>CLASS ACTION</u><br><br>**FIRST AMENDED COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

1    Plaintiffs HENRY YEH and G.Y., a minor, by and through his guardian Henry Yeh, on behalf of

2    themselves, all others similarly situated, and the general public, by and through their undersigned counsel,

3    hereby sue Defendant TESLA, INC. ("Tesla"), and allege the following upon their own knowledge, or where

4    they lack personal knowledge, upon information and belief, including the investigation of their counsel.

5                                          **INTRODUCTION**

6    1.    Tesla designs and manufactures electric vehicles. It is one of the world's most valuable

7    companies and, as of 2023, was the world's most valuable automaker. In 2021, the company had the most

8    worldwide sales of battery fully-electric vehicles and plug-in electric vehicles, capturing 21% of the battery-

9    electric market and 14% of the plug-in market.

10   2.    Tesla vehicles incorporate multiple advanced cameras into the vehicles' systems, including

11   at least the "Autopilot" and "Sentry Mode" systems, which collectively provide both 360-degree views

12   outside Tesla vehicles and views inside Tesla vehicles. Since at least 2019, the cameras in Tesla vehicles

13   sent to Tesla servers highly-invasive videos and images of the cars' owners, which Tesla employees were

14   able to access—not for communication, fulfillment of services, and enhancement of Tesla vehicle driving

15   systems—but for the tasteless and tortious entertainment of Tesla employees, and perhaps those outside the

16   company, and the humiliation of those surreptitiously recorded.

17   3.    By virtue of this defective system, Tesla employees accessed and circulated recordings of

18   Tesla customers and members of the public in private and embarrassing situations, without their consent.

19   This included, for example, video of a man approaching a Tesla vehicle completely naked, and video of

20   vehicle crashes and road-rage incidents. Tesla employees also shared pictures of family pets, which were

21   made into memes by embellishing them with captions or commentary before posting them in group chats.

22   While some postings were only shared between a few employees, others could be seen by "scores" of Tesla

23   employees. And as is common with internet culture, many of these videos and images were likely shared

24   with persons outside the company.

25   4.    That such videos and images were made available to Tesla employees to view and share, at

26   will, and for improper purposes, affects each and every person with a Tesla vehicle, their families,

27   passengers, the guests in their homes, and members of the public recorded in various situations.

28

5.      Plaintiffs bring this action against Tesla on behalf of themselves, similarly-situated Class Members, and the general public seeking public injunctive relief, injunctive relief on behalf of the Class, and compensation for injured Class Members.

**JURISDICTION & VENUE**

6.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from Tesla. In addition, more than two-thirds of the members of the class reside in states other than the state in which Tesla is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

7.      The Court has personal jurisdiction over Tesla as a result of Tesla's substantial, continuous and systematic contacts with the State, and because Tesla has purposely availed itself of the benefits and privileges of conducting business activities within the State, including by marketing, distributing, and selling Tesla automobiles in California. Moreover, during much of the time of the alleged behavior, Tesla was headquartered and had its principal place of business in California.

8.      Venue is proper in this Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Tesla resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**PARTIES**

9.      Plaintiff Henry Yeh is a citizen of California because he resides and is domiciled in South San Francisco, California. Mr. Yeh owns a 2022 Tesla Model Y, which he ordered in November 2021 and took delivery of in February 2022.

10.     Plaintiff G.Y. is a minor child and is a citizen of California because he resides and is domiciled in South San Francisco, California. G.Y. is the one-year old child of Plaintiff Henry Yeh and was born after Mr. Yeh took delivery of his Tesla vehicle in February 2022.

11.     Defendant Tesla is a Delaware corporation. Tesla was founded in San Carlos, California in 2003 and remained headquartered in California through December 1, 2021, on which date it relocated its headquarters to Austin, Texas.

**FACTS**

I.   **TESLA SYSTEMS UTILIZE CAMERAS TO CAPTURE, RECORD, AND TRANSMIT VIDEOS AND PHOTOS**

12.   Tesla uses multiple recording systems to record, and in some cases transmit videos and still images to servers under its control.

13.   Tesla customers understand that Tesla has this capability. But Tesla's Privacy Policy assures its millions of electric car owners that "Your privacy is and will always be enormously important to us"; that the cameras in its vehicles are "designed from the ground up to protect your privacy"; and that "camera recordings remain anonymous and are not liked to your or your vehicle."[1]

14.   Tesla further promises its customers that it will only ever use the videos and images it collects to "Communicate with you; Fulfill our products and services; and Improve and enhance development of our products and services."[2]

A.   **Tesla's Autopilot System**

15.   Tesla's Autopilot system is an advanced driver-assistance system that is integral to Tesla electric vehicles and a primary reason many consumers choose and pay more for Tesla vehicles than comparable vehicles without autopilot.

16.   Since September 2014, all Tesla cars have been shipped with sensors and software to support the Autopilot system.

17.   The Tesla Autopilot system includes eight cameras to capture 360-degree views around the vehicles. For many models, including Plaintiff Mr. Yeh's Model Y, the Tesla Autopilot system also includes a driver-facing camera. These cameras and the Autopilot system capture, record, and store activities taking place both within and outside Tesla vehicles.

18.   Tesla was the first automaker to introduce cameras with a 360-degree vision around its vehicles. These outside cameras record both video and audio, at all times, when the vehicles are in motion.

---

[1] Tesla Customer Privacy Notice, https://www.tesla.com/legal/privacy. A true and correct copy of the Privacy Notice is attached hereto as __Exhibit 1__ and expressly incorporated into this FAC.

[2] *Id.*

19. Since 2017, Tesla has been using connectivity with its Autopilot system to collect data from Tesla vehicles. At the time, the data collection was voluntary for Tesla customers, but even so, many owners were willing to let Tesla collect data since Tesla said it was using the data to feed its neural networks powering Autopilot and, later, Full Self-Driving systems (discussed further below).

20. Tesla created this data sharing opt-in program with the explicit promise that any data would be used to improve Tesla safety and security, saying "we need to collect short video clips using the car's external camera to learn how to recognize things like lane lines, street signs and traffic light positions. The more fleet learning of road conditions we are able to do, the better your Tesla's self-driving ability will become," and, moreover, that "we want to be super clear that these short video clips are not linked to your vehicle identification number. In order to protect your privacy, we have ensured that there is no way to search our system for clips that are associated with a specific car."

21. The amount of data shared with Tesla since 2017 as a result of this program has been massive. For example, one driver tweeted in October 2020 that, after just one day of driving using the Autopilot system, his car uploaded nearly 4 *gigabytes* of data.

22. When Tesla launched the Model 3 in around 2017, it began equipping the vehicle with a standard driver-facing camera located in the rearview mirror.  The Tesla Y, released in March 2020, was also manufactured with driver-facing cameras.

23. Initially, Tesla CEO Elon Musk dismissed the use of a camera-based driver monitoring system, saying Tesla would use its cabin-facing camera to prevent people from vandalizing cars when they are being driven automatically on Tesla's then-upcoming self-driving robotaxi network.

24. However, in or about June 2020, Tesla activated the cabin-facing cameras in all Model 3 and Model Y vehicles via a software update and started recording drivers, ostensibly to develop safety features and enhancements in the future. But Tesla continued to assure its drivers that the images captured by the cabin-facing camera would not be associated with the driver to protect his or her privacy.

25. At the start of the Full Self Driving ["FSD"] beta, Tesla told consumers that the cabin camera data was not transmitted to Tesla, nor associated with their vehicle identification number. There was no need for Tesla to obtain or store that data because the sole purported reason for the driver-facing camera was to "determine driver inattentiveness" and the need for audio-visual reminders to drivers "to keep your

4

eyes on the road when Autopilot is engaged." But Tesla's FSD policy changed as the beta went on, with Tesla writing in release notes in September 2021:

> The cabin camera above your rearview mirror can now determine driver inattentiveness and provide you with audible alerts, to remind you to keep your eyes on the road when Autopilot is engaged. Camera images do not leave the vehicle itself, which means the system cannot save or transmit information ***unless you enable data sharing***.[3]

26.     Tesla implemented a system to gauge whether drivers were "good" enough to participate in its FSD program. Tesla utilized what it called a "Safety Score," a formula dependent on data unique to each owner's account that gauged their attentiveness and ability to safely utilize the FSD. However, that meant that if consumers wanted to use FSD, they had no choice but to opt-in to the data sharing and were, effectively, forced to allow their vehicles to send non-anonymous images and recordings of the interior cabin to Tesla.

27.     As part of the wider rollout of Tesla's FSD option, which began in around October 2021, Tesla emailed its roughly 1,000 FSD users, writing "your vehicle has automatically opted into VIN associated telemetry sharing with Tesla, including Autopilot usage data, images and/or video." The drivers were told that if they did not want FSD access they could email Tesla and say so, but that those who wanted FSD had no other way to opt out of sharing their personal information.

28.     Around the same time, Tesla updated its privacy notice to say that if a driver opted out of data collection, because Tesla would not be able to "notify drivers of issues in real time," the vehicle would "suffer[] from reduced functionality, serious damage or inoperability."

**B.     Tesla's Sentry Mode**

29.     Tesla describes Sentry Mode in the Model 3 owner's manual "as an intelligent vehicle security system that alerts you when it detects possible threats nearby."

30.     When Sentry Mode is enabled, Tesla vehicles, even when powered off and locked, remain in a "standby" state in which the vehicles' cameras and sensors remain powered on and will record anything that Tesla considers to be "suspicious activity," including sudden movements within a certain proximity to the vehicle. If a "minimal threat" is detected, such as someone leaning on a car, Sentry Mode switches to an

---

[3] Tesla Owner's Manual, https://www.tesla.com/ownersmanual/modely/en_us/GUID-EDAD116F-3C73-40FA-A861-68112FF7961F.html (emphasis added).

"Alert" state and displays a message on the touchscreen warning that its cameras are recording. If a more severe threat is detected, such as someone breaking a window, Sentry Mode switches to an "Alarm" state, which activates the car alarm, increases the brightness of the center display, and plays music at maximum volume from the car's audio system.

31.     Prior to around October 2019, any recorded footage recorded by a Sentry Mode event is saved to a USB drive in a Tesla vehicle, if installed, but was not shared with anyone else, including Tesla. In October 2019, however, Tesla updated its privacy policy language about data collection related to Sentry Mode to specify that it would, through the cloud, backup Century Mode videos.

32.     Tesla continued to assure its vehicle owners and the public that, like with Autopilot, it was only collecting Sentry Mode data to improve self-driving and the safety of Tesla vehicles.

33.     As Tesla revised its privacy policies to permit itself to collect more and more data, Tesla offered repeated assurances that the privacy of drivers who opted-in to data sharing would be greatly protected. However, as described in detail below, Tesla employees invaded the privacy of Tesla vehicle owners and other members of the public and abused customer data for their own gratification and amusement.

**II.     IN VIOLATION OF ITS PRIVACY POLICY AND THEIR RIGHTS TO PRIVACY, TESLA STORED—AND TESLA EMPLOYEES ACCESSED, USED, AND SHARED—VIDEO RECORDINGS AND IMAGES OF CUSTOMERS AND OTHER MEMBERS OF THE PUBLIC, WITHOUT THEIR CONSENT**

34.     Between 2019 and 2022, Tesla employees, for their own personal reasons, and not for any legitimate business reason, viewed and shared sensitive images of both Tesla customers and other members of the public recorded by Tesla customers' vehicle cameras. At times, employees circulated these videos and images, sometimes after embellishing them.

35.     One crash video in 2021, for example, showed a Tesla driving at high speed in a residential area hitting a child riding a bike. The child flew in one direction, the bike in another. The video was spread around a Tesla office in San Mateo, California, via private one-on-one chats.

36.     Some recordings appeared to have been made when cars were parked and turned off. According to one former Tesla employee, for example, "We could see inside people's garages and their

private properties. Let's say that a Tesla customer had something in their garage that was distinctive, you know, people would post those kinds of things."

37.     Moreover, contrary to Tesla's representation that its camera recordings cannot be linked to individuals and their vehicles, the system Tesla used was, in fact, capable of—and did—show the location of recordings, meaning anyone viewing the videos and images could determine exactly where the Tesla owner lived, and therefore, who the Tesla owner was.

38.     Some former Tesla employees were troubled by these practices and opined "it was a breach of privacy." One employee even stated that they "would never buy a Tesla after seeing how they treated some of these people." Another former Tesla said, "I'm bothered by it because the people who buy the car, I don't think they know that their privacy is, like, not respected . . . . We could see them doing laundry and really intimate things. *We could see their kids.*"

39.     David Choffnes, executive director of the Cybersecurity and Privacy Institute at Northeastern University in Boston, called the sharing of sensitive videos and images by Tesla employees "morally reprehensible." Another expert noted that Tesla's actions have "nothing to do with the provision of a safe or secure car or the functionality" of Tesla's self-driving system.

40.     Tesla has a history of privacy violations. In February 2023, for example, Tesla agreed to change camera settings on vehicles sold in the European Union after a Dutch privacy regulator found that the previous settings allowed privacy violations.

41.     Tesla's conduct in violating privacy rights and reasonable expectations of privacy of Plaintiffs, Class Members, and other members of the general public is particularly egregious. Tesla captures recordings of people vulnerable on their own property, in their own garages, and even in their own homes, including at least one instance where Tesla cameras captured video of a man naked in his home. Tesla also captured and disseminated videos and images of customers' pets and even their children—a group that society has long recognized as vulnerable to exploitation and manipulation. Indeed, parents' interest in their children's privacy is one of the most fundamental liberty interests society recognizes. Moreover, when Tesla vehicles are parked or in motion where members of the public are likely to be captured, they are likely to capture non-vehicle-owner members of the public, including children. For example, a Tesla vehicle parked

in a driveway might capture the image of a child coming to visit the home. Indeed, Tesla employees shared videos of non-vehicle-owner members of the public being injured in vehicle collisions.

42.    "Invasion of privacy has been recognized [in California] as a common law tort for over a century." *Matera v. Google Inc.*, 2016 WL 5339806, at \*10 (N.D. Cal, Sept. 23, 2016) (citing Restatement (Second) of Torts §§ 652A-I for the proposition "that the right to privacy was first accepted by an American court in 1905, and 'a right to privacy is now recognized in the great majority of the American jurisdictions that have considered the question'"). "The common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others." Samuel D. Warren & Louis Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 198 (1890).

43.    The Restatement (Second) of Torts recognizes the same privacy rights through its tort of intrusion upon seclusion, explaining that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts § 652B (1977). The Supreme Court has similarly recognized the primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right to privacy older than the Bill of Rights." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).

44.    California amended its constitution in 1972 to specifically enumerate a right to privacy in its very first section, and courts have recognized that this affords individuals a private right of action for invasions of their privacy. See CAL. CONST. ART. I, § 1. The California Supreme Court has recognized the fundamental injuries at stake in privacy violations, explaining as follows:

> [A] measure of personal isolation and personal control over the conditions of its abandonment is of the very essence of personal freedom and dignity . . . A [person] . . . whose conversations may be overhead at the will of another . . . is less of a [person], has less human dignity, on that account. He who may intrude upon another at will is the master of the other and, in fact, intrusion is a primary weapon of the tyrant.

*Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 231 (1998) (quoting Edward J. Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39 N.Y.U. L. REV. 962, 973-74 (1964)); *see also Gill v. Curtis Pub. Co.*, 38 Cal. 2d 273, 276 (1952) ("Recognition has been given of a right to privacy, independent of the common rights to property, contract, reputation and physical integrity . . . . In short, it is the right to be let alone." (internal quotation marks omitted)).

45.     Tesla had reasonable alternatives to the defective system that allowed Tesla employees to access and circulate for their own amusement private video and images of customers without their consent. For example, Tesla could have not captured the images in the first place, or could have ensured that any video, images, and biometric data included therein, were inaccessible by Tesla employees.

46.     Given Tesla's defective system for maintaining the privacy of video and images captured by Tesla cameras, the only surefire fix to Tesla's invasion of privacy is to disable the cameras. Thus, Tesla drivers face a dilemma: continue to have their privacy invaded, or disable their Tesla vehicles cameras.

47.     While it is technically possible to disable the cameras on a Tesla vehicle, doing so has a significant impact on the functionality of the vehicle's various safety and driver assistance features, including the Autopilot system. Disabling the cameras also likely voids the warranty on the Tesla vehicles. As a result, if Tesla drivers want to avoid future invasions of their privacy, the value of their Tesla vehicles would almost certainly decrease, and substantially so.

48.     Moreover, disabling the cameras is difficult and requires technical expertise, which Mr. Yeh and most Class Members lack. Thus, in order to disable the cameras, Mr. Yeh and other vehicle owner Class Members will have to hire an authorized service technician to do it for them, which is an additional expense incurred to avoid having their privacy invaded in the future and they will lose access to features of the vehicle that they paid for.

49.     Regardless, absent the implementation of a system that adequately protects data captured by Telsa vehicle cameras, members of the public—including Plaintiffs when out in the public—will never be able to rest assured that their private data is not being abused by Tesla employees, since not every Tesla owner will disable their vehicle's cameras.

III.    **THERE IS A SUBSTANTIAL RISK PLAINTIFFS WERE RECORDED AND THAT TESLA EMPLOYEES HAD ACCESS TO THOSE RECORDINGS FOR IMPROPER PURPOSES**

50.     As they were expecting their first child, Mr. Yeh and his wife decided to purchase a 2022 Tesla Model Y because they believed it would be a safe and reliable vehicle. Mr. Yeh paid extra to have the FSD option on his Telsa vehicle.

51.     Privacy is important to Mr. Yeh and his wife. Mr. Yeh believed that, as a mature and sophisticated technology company, Tesla would be mindful of protecting his family's privacy. One reason

9

1    Mr. Yeh chose to purchase the Tesla Model Y over other EVs he was considering at the time, including the

2    Volkswagen ID.4 and Mustang Mache-E, was that he believed Tesla, as a dedicated technology company,

3    would be more sensitive to privacy and data concerns than more traditional car manufacturers.

4         52.    Mr. Yeh ordered his family's Model Y online in November 2021. After taking delivery of

5    the vehicle in February 2022, Mr. Yeh was assured by information presented to him on the vehicle's display

6    screen that any videos or images captured by the vehicle's cameras while in "Sentry Mode" would never

7    leave the car, *i.e.*, that they would only be stored locally on the vehicle's data storage system. Based on that

8    assurance, Mr. Yeh activated "Sentry Mode" and—until recently when he deactivated it—kept it active at

9    all times, including while the vehicle was parked in his garage.

10        53.    Mr. Yeh and his wife expected privacy in their own home, including in their garage where

11   they kept their Tesla vehicle. In line with that expectation of privacy, they would occasionally walk around

12   in their garage in various stages of undress.

13        54.    Given the reports that Tesla employees had access to, and did access videos and images of

14   Tesla owners in their homes and in their garages in various states undress, there is a risk Tesla employees

15   accessed videos and images of Plaintiffs.

16        55.    That Tesla employees even had potential access to such videos and images of Plaintiffs is

17   highly offensive to Plaintiffs, especially in light of Mr. Yeh's reading and relying on his Tesla vehicle's on-

18   screen message that any such images and videos would only be stored locally on his Tesla's data storage

19   system.

20        56.    Mr. Yeh and his wife care deeply for the privacy of their child, Plaintiff G.Y. They do not

21   share any photos of G.Y. online and do not maintain any social media accounts for G.Y. That photos and

22   videos of their one-year old child were available to be viewed by Tesla employees for personal, non-business

23   reasons is highly offensive and intrudes upon not only the privacy rights of G.Y., but interferes with Mr.

24   Yeh and his wife's rights as parents to keep images and videos of G.Y. out of the hands of strangers.

25        57.    Plaintiff Yeh would not have purchased his Tesla vehicle, or would only have paid less for

26   it, if he knew that its camera systems were capable of surreptitiously recording him and his family and that

27   those recordings could be accessed by Tesla employees for personal, non-business reasons. Alternatively,

28   Mr. Yeh would not have purchased the Tesla, or would have paid less for it, and would not have engaged

"Sentry Mode" on his vehicle, if he knew that doing so increased the chances he and his family would be recorded while engaged in private activities for which he and his family had an expectation of privacy. That Mr. Yeh could effectively not use "Sentry Mode" without being at risk of being recorded and viewed by Tesla employees for improper purposes caused his Tesla vehicle to be worth less than what he paid for it because it now lacked an important feature. For example, by virtue of being unable to keep Sentry Mode on, Mr. Yeh is no longer able to use a solar charger for his vehicle that otherwise continuously charges the vehicle when not in use.

## IV.   CONGRESS REQUESTED INFORMATION FROM TESLA REGARDING THE PRIVACY VIOLATIONS BUT TESLA HAS FAILED TO RESPOND

58.   On April 14 2023, Senator Edward Markey of Massachusetts and Senator Richard Blumenthal of Connecticut sent a letter to Elon Musk, as CEO of Tesla, Inc., citing an "alarming" report that "Tesla employees have shared private photos and videos captured by cameras in Tesla customers' vehicles." Referring to Tesla's privacy policy as "deeply misleading," the Senators requested that Tesla address what they saw as Tesla's "apparent willful disregard for the privacy of Tesla customers" that "is unacceptable and raises serious questions about Tesla's management practices."[4]

59.   While urging Tesla "to take all necessary actions to ensure that any images or videos consensually collected from Tesla vehicles are subject to strict privacy safeguards," the letter also requested that, on or before May 5, 2023, Tesla respond to several important questions, including:

*1.   Please fully describe the purposes for which Tesla collects and retains vehicle recordings, how long those recordings are kept, and who has access to them.*

*2.   Does Tesla restrict access to these vehicle camera recordings to certain employees or contractors through policy and technical measures? If so, please describe in detail those restrictions.*

*3.   Why were Telsa's policy and technical measures unable to prevent the wrongful sharing of vehicle recordings? Has Tesla investigated this misuse of highly invasive customer information?*

---

[4] *Available at* https://www.markey.senate.gov/download/letter-to-tesla-on-vehicle-camera-recordings-from-senators-markey-and-blumenthal

4.    *Were Tesla executives aware that their employees were sharing consumer vehicle recordings, including videos and images, on internal company messaging software prior to Reuters' public reporting on this topic?*

    a.    *If so, for how long were the executives aware of this employee behavior and what steps did Tesla take to stop this employee behavior?*

    b.    *If not, will Tesla commit to taking all necessary steps, including formal policy changes, to ensure that this breach of consumer privacy does not happen again?*

5.    *Are Tesla executives certain that Tesla employees no longer share vehicle camera recordings for unauthorized purposes?*

6.    *Tesla's Customer Privacy Policy states that camera recordings "remain anonymous," but the Reuters report suggests that a customer's location could be easily deduced from those recordings, including tagging those videos on a map. Please describe the steps Tesla has taken to protect user anonymity.*

    a.    *What steps is Tesla taking to ensure that the camera recordings are actually anonymous?*

    b.    *Will Tesla commit to taking all necessary steps, including formal policy changes, to ensure that vehicle camera recordings do not identify the location of the Tesla customer?*

60.    Tesla has, as of the date of this amended complaint, refused to respond to the Senators' requests for information.

## CLASS ACTION ALLEGATIONS

61.    While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a class of all persons in the United States, whose images were captured by Tesla Vehicle cameras at any time during the Class Period, from April 7, 2019 to the time a class is notified (the "Class"). Plaintiffs further seek to represent a subclass of all persons in California whose images were captured by Tesla Vehicle cameras at any time during the Class Period (the "California Subclass"). Plaintiff Henry Yeh further seeks

12

to represent the following subclasses: (a) All persons in the United States who, at any time during the Class Period owned or leased a Tesla vehicle (the "Nationwide Vehicle Owner Subclass"); and (b) All persons in the California who, at any time during the Class Period owned or leased a Tesla vehicle (the "California Vehicle Owner Subclass").

62. The members in the proposed Class (including the individual Subclasses) are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

63. Questions of law and fact common to Plaintiffs and the Class include:

   a. Whether Tesla collected and stored videos, images, and/or biometric data of Class Members;

   b. Whether Tesla employees could access or did access videos, images, and/or biometric data of class members;

   c. Whether Tesla's collection, storage, and dissemination of videos, images, and biometric data of Class Members as described herein was highly offensive to a reasonable person;

   d. Whether Tesla's conduct constituted and invasion of privacy based on California's common law protection against intrusion upon seclusion public policy;

   e. Whether Tesla's conduct constitutes a violations of the California Constitution right to privacy;

   f. Whether Tesla's conduct violated the California Unfair Competition Law because it was fraudulent, unlawful, or unfair;

   g. Whether Plaintiffs and other Class Members are entitled to monetary damages and the measure of those damages;

   h. Whether Plaintiffs and other Class Members are entitled to restitution, disgorgement, or other equitable or injunctive relief; and

   i. The proper amount of attorneys' fees.

64. These common questions of law and fact predominate over questions that affect only individual Class Members.

65.     Plaintiffs' claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Tesla's conduct.

66.     Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation.

67.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

68.     Tesla has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

69.     As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), and may be appropriate with respect to specific questions under Fed. R. Civ. P. 23(b)(4).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Intrusion Upon Seclusion

70.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

71.     Plaintiffs and Class Members have reasonable expectations of privacy in their homes and in their vehicles, generally. The expectation of privacy in their homes is intrinsic. Their expectation of privacy in their vehicle stemmed from Tesla's clearly-stated policy that it would not misuse videos or images it captures, and from the on-screen display in the Tesla vehicles stating that "Sentry Mode" photos and videos would only be stored locally on the vehicle's data storage system, and not uploaded to Tesla.

72.     Members of the public also have a reasonable expectation that their images (including video of them) will not be captured by Tesla without their consent and used for the amusement of Tesla employees. In fact, non-vehicle owner members of the public have never consented to a Tesla vehicle recording them under any circumstance.

73.     Tesla's intrusions by viewing and sharing videos and images of customers and their activities, even in their own homes, as well as members of the public, especially in embarrassing or tragic situations, are highly offensive to a reasonable person. This is evidenced by, *inter alia*, Tesla's own employees' accounts of Tesla's actions. It is also evidenced by Tesla recording and Tesla employees sharing images and videos of children, exploiting their special vulnerabilities.

74.     Plaintiffs, other Class Members, and the general public were harmed by the potential (and in some cases actual) intrusion by Telsa into their private affairs as detailed throughout this Complaint. Tesla's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs, other Class Members, and the general public.

## SECOND CAUSE OF ACTION

### Violation of California's Constitutional Right to Privacy,

### Cal. Const. Art. 1, § 1

75.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

76.     Plaintiffs and other Class Members' private affairs include their behavior in their homes, on their property, and in their vehicles, as well as any other behavior, including in public, that may be captured by surreptitious recording by Tesla vehicles.

77.     Defendant intentionally intruded on and into Plaintiffs' and other Class Members' solitude, seclusion, and private affairs by intentionally and surreptitiously recording, reviewing, sharing, and/or retaining their activities through the monitoring and recording activities described herein. These intrusions are highly offensive to a reasonable person.

78.     These societal expectations and laws created a duty that Telsa owed to Plaintiffs and other Class Members. Tesla breached that duty by implementing a system permitting the surreptitiously recording, review, retention, and sharing of recordings of private activities by persons unauthorized to do so, and without legitimate justification, as described herein.

79.     Tesla's conduct described herein violated Plaintiffs' and other Class Members' right to privacy, as guaranteed by ART. 1, § 1 of the California Constitution. Defendant's actions and conduct

complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and other Class Members.

### THIRD CAUSE OF ACTION

### Violation of the Right to Publicity

### Cal. Civ. Code § 3344

80.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

81.     Pursuant to Cal. Civ. Code § 3344(a), "[a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of products, merchandise, goods or services, without such person's prior consent, or, in the case of a minor, the prior consent of his parent or legal guardian, shall be liable for any damages sustained by the person or persons injured as a result thereof."

82.     As alleged herein, Tesla knowingly used Plaintiffs' and other Class Members' images to improve its products and thereby enable itself to market its vehicles with advanced features that command a premium in the marketplace, such as Autopilot and FSD.

83.     Tesla did not compensate Plaintiffs and other Class Members for its commercial use of their photographs (including images obtained through video) and likenesses. *See* Cal. Civ. Code § 3344(b).

### FOURTH CAUSE OF ACTION

### Violation of the California Unfair Competition Law,

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

84.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

85.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

86.     The acts, omissions, misrepresentations, practices, and non-disclosures of Tesla alleged herein constitute business acts and practices.

### Fraudulent

87.     The acts, omissions, misrepresentations, practices, and non-disclosures of Tesla were fraudulent because they induced Mr. Yeh and other Nationwide Vehicle Owner Subclass Members (including California Vehicle Owner Subclass Members) to purchase or lease Tesla electric vehicles under false pretenses.

### Unlawful

88.     The acts of Tesla alleged herein are "unlawful" under the UCL in that, as alleged herein, they violate at least the California Constitutional right to privacy, the right of publicity under Cal. Civ. Code § 3344, and the Consumer Legal Remedies Act, and further constitute breach of contract, negligence, negligent misrepresentation, intentional misrepresentation, and unjust enrichment.

89.     Plaintiffs reserve the right to allege other violations of law that constitute other unlawful business acts or practices.

### Unfair

90.     Tesla's conduct was unfair because it was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, did not outweigh the gravity of the harm to its consumers.

91.     Tesla's conduct was also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the California Constitution.

92.     Tesla's conduct was also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided.

93.     There were reasonably available alternatives to further Tesla's legitimate business interests, other than the conduct described herein.

*          *          *

94.     Tesla profited from, and Plaintiffs and other Class Members and suffered injury in fact and lost money as a result of Tesla's fraudulent, unlawful, and unfair conduct.

**FIFTH CAUSE OF ACTION**

**Violation of the California Consumer Legal Remedies Act,**

**Cal. Civ. Code §§ 1750 *et seq.***

95.     Plaintiff Henry Yeh realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

96.     The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

97.     Tesla's false and misleading statements, omissions, policies, acts, and practices were designed to, and did, induce the purchase or lease and use Tesla vehicles by Plaintiff Henry Yeh and other members of the Nationwide Vehicle Owner Subclass (including members of the California Vehicle Owner Subclass) for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

a.     § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.     § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.     § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.     § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

98.     Tesla profited from the sale of the deceptively advertised Tesla vehicles to unwary consumers.

99.     Tesla's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

100.    Pursuant to California Civil Code § 1782, more than 30 days before filing this amended complaint, Mr. Yeh sent written notice of his claims and of Tesla's particular violations of the Act to Tesla by certified mail, return receipt requested, but Tesla has failed to implement remedial measures.

101.    Plaintiff Henry Yeh and the members of the Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass have suffered harm. *See* Cal. Civ. Code § 1782(d).

102.  In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue was filed with the original complaint. *See* Dkt. No. 1-3.

## SIXTH CAUSE OF ACTION

### Negligence

103.  Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

104.  Tesla owed Plaintiffs a duty of care. In violation of that duty, Tesla negligently, carelessly, recklessly, and/or unlawfully transmitted, stored, and permitted access to sensitive personal and biometric information, including video recordings and images.

105.  As a direct and legal result of Tesla's wrongful conduct and omissions, Plaintiffs and other Class Members have sustained damages in a sum to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

### (On Behalf of the Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Only)

106.  Plaintiff Henry Yeh realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

107.  Tesla's Privacy Policy was a contract between Tesla and purchasers and lessees of Tesla vehicles, including Plaintiff Mr. Yeh. Indeed, when he ordered his vehicle, Mr. Yeh was required to agree to Tesla's Privacy Policy.

108.  Tesla violated the contract in that the cameras in Tesla vehicles did not "protect [their] privacy" and the video and images captured by the cameras did not "remain anonymous." Tesla also did not limit data captured by the cameras, as it promised in the contract, to "Communicat[ing] with you; Fulfilling [Tesla's] products and services; and Improv[ing] and enhanc[ing] development of [Tesla's] products and services."

109.  As a direct and proximate result of Tesla's breach of contract, Plaintiff Henry Yeh and other Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Members have been damaged in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(On Behalf of the Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Only)**

110.    Plaintiff Henry Yeh realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

111.    Tesla marketed its vehicles in a manner conveying to reasonable consumers that their privacy is protected. Reasonable consumers would attach importance to such representations and would be induced to act thereon in making purchase or leasing decisions.

112.    In selling vehicles, Tesla acted in the ordinary course of its business and had a pecuniary interest in Plaintiff Henry Yeh and other Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Members purchasing or leasing vehicles.

113.    Tesla owed a duty of care to Plaintiff Henry Yeh and other Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Members, not to provide them false information when they were making their purchase or lease decisions regarding Tesla vehicles.

114.    Tesla knew or had been negligent in not knowing that its system for protecting the privacy of customers whose video and images were taken by Tesla cameras was ineffective or defective.

115.    Tesla intended that Mr. Yeh and other consumers rely on these representations, as evidenced by the intentional and conspicuous placement of the misleading representations on Tesla's website.

116.    Mr. Yeh and other Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Members reasonably and justifiably relied on Tesla's misrepresentations and omissions when purchasing or leasing Tesla vehicles. Had the correct facts been known, they would not have purchased or leased Tesla vehicles at the prices at which they were offered.

117.    Therefore, as a direct and proximate result of Tesla's negligent misrepresentations, Mr. Yeh and other Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Members have suffered economic losses and other general and specific damages, in the amount of the Tesla vehicles' purchase or lease prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**

**Intentional Misrepresentation**

**(On Behalf of the Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Only)**

118.   Plaintiff Henry Yeh realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

119.   Tesla marketed its vehicles in a manner conveying to reasonable consumers that their private and biometric data and information obtained through Tesla vehicles' cameras would be protected and remain private. Reasonable consumers would attach importance to such representations and would be induced to act thereon in making purchase or lease decisions.

120.   Tesla knew that the misrepresentations were misleading, or acted recklessly in making the misrepresentations without regard to their truth.

121.   Tesla intended that Mr. Yeh and other Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Members rely on these misrepresentations, as evidenced by the intentional placement of the misleading representations on its website.

122.   Mr. Yeh and other Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Members have reasonably and justifiably relied on Tesla's intentional misrepresentations when purchasing or leasing Tesla vehicles; had the correct facts been known, they would not have purchased or leased Tesla vehicles at the prices at which the vehicles were offered.

123.   Therefore, as a direct and proximate result of Tesla's intentional misrepresentations, Mr. Yeh and other Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Members have suffered economic losses and other general and specific damages, in the amount of the Tesla Vehicles' purchase or lease prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**

**Unjust Enrichment**

124.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

125.   Plaintiffs, other Class Members, and members of the public conferred benefits on Tesla by purchasing or leasing Tesla vehicles with defective camera control systems, and by providing to Tesla, without consent, their biometric and personal information, including their images, for Tesla's use in commercial pursuits.

126.   Tesla was unjustly enriched in retaining revenues derived from Plaintiffs and other Class Members' purchase or lease of Tesla vehicles containing defective camera control systems, as well as revenue obtained from the unauthorized access, use, and leverage of customers' and others' private and biometric data.

127.   Tesla's retention of those moneys under these circumstances is unjust and inequitable. Tesla's acts and omissions caused injury to Plaintiffs, other Class Members, and members of the public. Plaintiff Henry Yeh and other Nationwide Vehicle Owner Subclass and California Vehicle Owner Subclass Members would not have purchased or leased Tesla vehicles at the prices they did if the true facts had been known, and would not have consented to the capture and use of their biometric data and personal images, if Tesla had not engaged in the malfeasance alleged.

128.   Because Tesla's retention of non-gratuitous benefits conferred on it by Plaintiffs, other Class Members, and members of the public is unjust and inequitable, Tesla has been unjustly enriched in an amount to be determined at trial.

## PRAYER FOR RELIEF

129.   Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Tesla as to each and every cause of action, and the following remedies:

   a.   An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

   b.   An Order requiring Tesla to bear the cost of Class Notice;

   c.   A judgment awarding Plaintiffs other Class Members appropriate monetary relief, including statutory (*i.e.*, under Cal. Civ. Code § 3344(a)), actual, compensatory, and punitive damages (as permitted by law), in an amount to be determined at trial;

   d.   Public injunctive relief enjoining Tesla's future violation of the Unfair Competition Law and Consumers Legal Remedies Act;

1        e.     Public injunctive relief enjoining Tesla from making additional misrepresentations

2 and omissions regarding its privacy polices and practices in marketing its vehicles;

3        f.     Public injunctive relief enjoining Tesla's future recording, viewing, sharing, and

4 profiting from videos and images of non-Tesla owners (and Tesla owners when not recorded by their

5 own vehicles) in violation of state law;

6        g.     Public injunctive relief compelling Tesla's destruction of all personal data obtained

7 from non-Tesla owners (and Tesla owners when not recorded by their own vehicles) in violation of

8 state law;

9        h.     Classwide and public injunctive relief enjoining Tesla's future recording, viewing,

10 sharing, and profiting from videos and images of members of the Nationwide Vehicle Owner Class

11 (including the California Vehicle Owner Class) and lessees in violation of state law;

12        i.     Classwide and public injunctive relief compelling Tesla's destruction of all personal

13 data obtained from members of the Nationwide Vehicle Owner Class (including members of the

14 California Vehicle Owners Class) thereby in violation of state law;

15        j.     A judgment awarding any and all further equitable, injunctive, and declaratory relief

16 as may be appropriate;

17        k.     Pre-judgment and post-judgment interest, as permitted by law;

18        l.     Attorneys' fees and costs; and

19        m.     Any other and further relief that Court deems necessary, just, or proper.

20 **<u>JURY DEMAND</u>**

21   130.    Plaintiffs hereby demand a trial by jury on all issues so triable.

22

23 Dated: June 30, 2023        /s/  Jack Fitzgerald

24                          **FITZGERALD JOSEPH LLP**
                           JACK FITZGERALD

25                          *jack@fitzgeraldjoseph.com*
                         PAUL K. JOSEPH

26                          *paul@fitzgeraldjoseph.com*
                         MELANIE PERSINGER

27                          *melanie@fitzgeraldjoseph.com*
                         TREVOR M. FLYNN

28

23

*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD
*tblood@bholaw.com*
THOMAS J. O'REARDON
*toreardon@bholaw.com*
JAMES M. DAVIS (SBN 301636)
*jdavis@bholaw.com*
501 West Broadway, Suite 1490
San Diego, CA 92101
Phone: (619) 338-1100

***Counsel for Plaintiffs***