# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA M. LAMBRIX, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>TESLA, INC.,<br><br>    Defendant. | Case No. 23-cv-01145-TLT<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>Re: ECF No. 75 |

Before the Court is Tesla, Inc.'s ("Defendant") motion to compel arbitration and stay the proceedings of plaintiffs Danielle Thys, Cary Phillips, and Levi Stoffal (collectively "Plaintiffs"). Def.'s Mot. to Compel Arbitration ("Arb. Mot."), ECF No. 75. Having carefully considered the parties' briefs, oral arguments, relevant legal authority, and for the reasons below, the Court **GRANTS** Defendant's motion to compel arbitration. Accordingly, the Court **STAYS** the proceedings as to the claims asserted by Plaintiffs Thys, Phillips, and Stoffal only.

**I.   BACKGROUND**

   **A.   Procedural Background**

Plaintiffs Virginia M. Lambrix, Sean Bose, Patrick Doyle, Philomena Nana-Anyangwe, Andrew Ragone, Anthony Adjuder, Cary Phillips, Jason Pratti, Levi Stoffal, and Danielle Thys initiated this class action lawsuit against Defendant, bringing several causes of action under the Sherman Act, the California Cartwright Act, and the California Unfair Competition Law ("UCL"). Consolidated Amended Class Action Complaint ("Am. Compl.") *passim*, ECF No. 63. After Plaintiffs consolidated their lawsuit, Defendant filed the instant motion against Plaintiffs Thys, Phillips, and Stoffal on July 31, 2023. *See* ECF No. 75. Plaintiffs timely filed an opposition on August 14, 2023. Pls.' Opp'n to Arb. Mot. ("Opp'n"), ECF No. 80. A reply was timely filed on

1  August 21, 2023. Def.'s Reply to Opp'n ("Reply"), ECF No. 89. On August 28, 2023, Plaintiffs
2  sought leave to file a Request for Judicial Notice which is decided with the instant motion. Pls.'
3  Mot. for Leave to File Request for Judicial Notice ("Req."), ECF No. 94. Oral argument on the
4  motion was held on September 6, 2023. *See* ECF No. 102.

### B.  Factual Background

Defendant is a multinational automotive and clean energy company that designs, manufactures, and sells high-performance battery-electric motor vehicles ("EVs") intended to be operated on public streets. Am. Compl. ¶¶ 19, 21, 28. Although Defendant's primary business is selling vehicles to consumers, it also designs and manufactures compatible parts for its EVs and operates over 150 "Service Centers" that provide repair and maintenance services across the United States—46 Service Centers are in California. *See id*. ¶ 22. Defendant alternatively directs vehicle owners (and lessors) to "Tesla-Approved Collision Centers" or "Tesla-Preferred Collision Centers" that are independently owned and operated. *See id*. ¶ 55.

Each Plaintiff either purchased or leased a vehicle from Defendant. Following the purchase and lease of their vehicles, Plaintiffs purchased Tesla Repair Services and Tesla-Compatible Parts from Defendant or one of its authorized collision centers. Opp'n 5 (citing Am. Compl. ¶¶ 3, 15, 17-18). Plaintiff Thys and Phillips are both California citizens. *Id.* ¶¶ 15, 18. Plaintiff Stoffal is an Oregon citizen. *Id.* ¶ 17.

### 1.  Plaintiff Danielle Thys

On January 5, 2019, Plaintiff Danielle Thys signed a Retail Installment Sales Contract "on every page" when purchasing a 2015 Model S Tesla from Defendant. Decl. of Jasjit Ahluwalia ("Ahluwalia Decl.") Ex. A at 7, ECF No. 75-2. Thys' agreement contained an arbitration provision, which stated "[either you or we may choose to have any dispute between us decided by arbitration and not in court or by jury trial.]" *Id*. The provision obligated Thys to resolve any claim or dispute related to the purchase or condition of the vehicle by neutral binding arbitration. *Id*. On the second to last page of the agreement, Plaintiff Thys signed under bolded, capitalized text stating:

> YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ ALL PAGES OF THIS CONTRACT, INCLUDING THE ARBITRATION PROVISION ON PAGE 7 OF THIS CONTRACT, BEFORE SIGNING BELOW.

*Id.* at 6.

### 2. Plaintiff Cary Phillips

On June 7, 2022, Plaintiff Cary Phillips ordered the purchase of a 2022 Model Y Tesla from Defendant. Arb. Mot. 5 (*citing* Ahluwalia Decl. ¶ 15). To purchase the vehicle online, Defendant explains that consumers are required to click "Place Order" after accessing the order payment screen on an internet-based electronic device. Decl. of Minu Sinha ("Sinha Decl.") ¶¶ 4, 5, 9, ECF No. 75-6. Plaintiff Phillips clicked "Place Order." *Id.* The "Place Order" button is accompanied by language that states "[b]y placing this order, I agree to the Model Y Order Agreement, Terms of Use, and Privacy Notice." Sinha Decl. ¶ 5. One agreement titled "Model Y Order Agreement" directly hyperlinks consumers to an online copy, which contains an "Agreement to Arbitrate" provision. *See id.* The provision states:

> If you have a concern or dispute, please send a written notice describing it and your desired resolution to resolutions@tesla.com. If not resolved within 60 days, you agree that any dispute arising out of or relating to any aspect of the relationship between you and Tesla will not be decided by a judge or jury but instead by a single arbitrator in an arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules. This includes claims arising before this Agreement, such as claims related to statements about our products.

Ahluwalia Decl. Ex. B at 3, ECF No. 75-3. The same provision also states "[y]ou may opt out of arbitration within 30 days after signing this Agreement by sending a letter to [Tesla]" and "[i]f you do not opt out, this agreement to arbitrate overrides any different arbitration agreement between us, including any arbitration agreement in a lease or finance contract." Decl. of Adrian Castaneda ("Castaneda Decl.") ¶ 5, ECF No. 75-9. Phillips clicked "Place Order." Sinha Decl. ¶¶ 9. Phillips did not mail an opt-out request letter. Castaneda Decl. ¶ 6.

//

//

### 3. Plaintiff Levi Stoffal

On January 30, 2021, Plaintiff Levi Stoffal entered into an Order Agreement with Defendant to lease a 2021 Tesla Model 3 online. Ahluwalia Decl. Ex. C at 4, ECF No. 75-4. On March 24, 2021, the vehicle was delivered to Plaintiff Stoffal, and upon delivery he signed a lease agreement. Ahluwalia Decl. ¶ 18. The "Stoffal Lease Agreement" contained an arbitration provision that states "[this provision] overrides any different arbitration agreement between us," intended to mean the Stoffal Lease Agreement supersedes the arbitration clause in the Order Agreement. Ahluwalia Decl. Ex. D at 3. The Stoffal Lease Agreement contained a provision titled "Agreement to Arbitrate" states:

> If you have a concern or dispute, please send a written notice describing it and your desired resolution to resolutions@tesla.com. If not resolved within 60 days, you agree that any dispute arising out of or relating to any aspect of the relationship between you and Tesla will not be decided by a judge or jury but instead by a single arbitrator in an arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules. This includes claims arising before this Agreement, such as claims related to statements about our products.

*Id*. The same provision also states "[y]ou may opt out of arbitration within 30 days after signing this Agreement by sending a letter to [Tesla]" and "[i]f you do not opt out, this agreement to arbitrate overrides any different arbitration agreement between us, including any arbitration agreement in a lease or finance contract." *Id*. "Plaintiff Stoffal did not mail an opt-out request letter." Decl. Castaneda ¶ 6.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to all contracts involving interstate commerce and states in part that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. A party seeking to compel arbitration can do so under the FAA. *Id.* § 4. The FAA also governs the enforceability and scope of arbitration agreements. *Id.* §§ 1-307. "[C]ourts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, (2011) (first *citing Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, (2006)); and then *citing*

4

*Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

"As the party seeking to compel arbitration, [the defendant] bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *See Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023) (*quoting Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)). The FAA reflects both a "'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract.'" *Concepcion*, 563 U.S. at 339 (first *quoting Moses H. Cone, Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); and then *quoting Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

When deciding a motion to compel arbitration, a district court must "treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *See Totten v. Kellogg Brown & Root, LLC*, 152 F. Supp. 3d 1243, 1249 (C.D. Cal. 2016) (citations omitted). Additionally, courts apply federal substantive law to questions regarding the interpretation and enforceability of arbitration agreements generally, and state contract law to questions concerning whether the parties agreed to arbitrate. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). To determine whether a state "common law rule makes an agreement to arbitrate unenforceable, [the Court] must consider both the federal law of arbitration and the state rule at issue." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1022 (9th Cir. 2016).

## III. REQUEST FOR JUDICIAL NOTICE

Plaintiffs' Request for Judicial Notice pursuant to Federal Rules of Evidence Section 201(b) is **GRANTED**. In support of their opposition to the motion to compel, Plaintiffs request that the Court take judicial notice of (1) the full terms of service, including the arbitration provision in *Johnson*, and (2) the JAMS Streamlined Arbitration rules and Procedures. Req. 1. Of note, the impetus of this request comes in response to Defendant making new arguments in its Reply brief. *Id.*

Rule 201(b) "governs judicial notice of an adjudicative fact only," and provides for a court to "judicially notice a fact that is not subject to reasonable dispute because it: (1) [i]s generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily

5

determined from sources whose accuracy cannot reasonably be questions." Fed. R. Evid. 201(a)-(b)(2). The Ninth Circuit has explained that "[t]he district court need not consider arguments raised for the first time in a reply brief." *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (*quoting Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)). Likewise, courts commonly will not consider evidence submitted for the first time in reply without giving the opposing party an opportunity to respond. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). However, to the extent any facts in documents are subject to reasonable dispute, the Court will not take judicial notice of those facts. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

While responsive to arguments made in Plaintiffs' opposition brief, Defendant indeed argues—for the first time in its reply—that the delegation clause in its agreements with Plaintiffs serve as "'an additional, antecedent agreement' that is separate" from an agreement to arbitrate Plaintiffs' causes of actions. Reply 5 (*citing Rent-A-Ctr., W., Inc.*, 561 U.S. at 68-69). Thus, contrary to Plaintiffs' "separate, independent transaction exception" argument made pursuant to *Johnson*, Defendant suggests that the delegation clause governs the Court's decision in the instant case and is distinguished from *Johnson*. Reply 3-6; *see also Johnson*, 57 F.4th at 683. The Court addresses the substantive issue related to the delegation clause separately below. Procedurally, however, the Court declines to accept new arguments presented for the first time at this stage in the pleadings.

Having considered the parties' briefs, oral arguments on the matter, and relevant legal authority, the Court finds no reason to depart from the Ninth Circuit precedent guiding courts not to consider evidence or argument first submitted on reply. The Court **GRANTS** Plaintiffs' Request to take judicial notice of (1) the full terms of service, including the arbitration provision in *Johnson*, and (2) the JAMS Streamlined Arbitration rules and Procedures. During oral argument, the Court recognized that the Defendant, without leave of the Court, proffered a new argument in its reply brief.[1] *Lambrix et al. v. Tesla, Inc.*, No. 23-1145 (N.D. Cal. argued Sept. 5, 2023).

---

[1] It did not escape the Court's notice that Defendant's new argument in its reply brief obfuscated the Court's page limitations as mandated by Civil Local Rule 7-7. Such conduct could also be interpreted as an effort to sandbag the Plaintiffs. After all, Defendant filed the instant motion on July 31, 2023 while *Johnson v. Walmart*, 57 F.4th 677 (9th Cir. 2023) was published on January

1  Plaintiff was allowed to address the issues in oral argument and the Court considered those

2  arguments in its analysis below.

3  **IV. DISCUSSION**

4        The Federal Arbitration Act ("FAA") governs the motion to compel arbitration. 9 U.S.C.

5  §§ 1-16. Under the FAA, when considering if an order compelling arbitration is warranted, a

6  district court determines: (1) whether a valid agreement to arbitrate exists and, if it does, (2)

7  whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic*

8  *Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). When a court answers both questions in the

9  affirmative, it must "enforce the arbitration agreement in accordance with its terms." *Johnson*, 57

10  F.4th at 680–81 (9th Cir. 2023) (*citing Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir.

11  2020) (citation omitted). "[W]hile doubts concerning the scope of an arbitration clause should be

12  resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an

13  agreement to arbitrate has been made." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743

14  (9th Cir. 2014) (internal quotation marks omitted). The Motion to Compel Arbitration is

15  **GRANTED** for the following reasons: (1) Plaintiffs agreed to arbitrate disputes about their

16  vehicles with Defendant; (2) Plaintiffs agreed to delegate their disputes to an arbitrator; and (3)

17  Plaintiffs' arbitration agreements encompass their antitrust claims.

18        **A.    Plaintiffs Agreed to Arbitrate Disputes About Their Vehicles.**

19        As a threshold matter, the Court first determines whether the parties agreed to arbitrate.

20  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (*citing* 9 U.S.C. § 2).

21  In ruling on a motion to compel arbitration, a court's "first principle" is that "[a]rbitration is

22  strictly a matter of consent . . . and thus is a way to resolve those disputes—*but only those*

23  *disputes*—that the parties have agreed to submit to arbitration." *See Granite Rock Co. v. Int'l Bhd.*

24  *of Teamsters*, 561 U.S. 287, 299 (2010) (emphasis in original) (citations omitted). Hence, courts

25  use "general state-law principles of contract interpretation to decide whether a contractual

---

27  10, 2023. The Court frowns upon such gamesmanship and should such conduct occur in the
28  future, the offending party may be subject to appropriate sanctions and disciplinary review. *See* Civil L.R. 11-6 to 11-8.

1  obligation to arbitrate exists." *See Goldman, Sachs & Co.*, 747 F.3d at 744; *First Options of Chi.*
2  *Inc.*, 514 U.S. at 944.
3        California law principles apply to Plaintiffs Thys and Phillips, and Oregon law principles
4  apply to Plaintiff Stoffal. Am. Compl. ¶¶ 15-18. To meet the essential elements for a contract,
5  the law in both states require that the parties to have capacity to contract, consent, a lawful object
6  in their agreement, and to have agreed for consideration to form a valid agreement. *See U.S. ex*
7  *rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (citing Cal. Civ. Code § 1550); *see*
8  *also Bliss v. Southern Pac. Co.*, 212 Or. 634, 646 (1958); *see also Reed v. Ezelle Inv. Props. Inc.*,
9  353 F. Supp. 3d 1025, 1031 (D. Or. 2018) (citations omitted). As the party seeking arbitration, the
10 defendant bears the burden of proving the existence of an agreement to arbitrate by a
11 preponderance of the evidence. *Johnson*, 57 F.4th at 681 (citation omitted); *Brown v. Stored*
12 *Value Cards, Inc.*, No. 15-01370, 2021 WL 5984468, at *1 (D. Or. Dec. 6, 2021), *aff'd*, No. 21-
13 36031, 2022 WL 17844168 (9th Cir. Dec. 22, 2022) (citation omitted).

### 1. Plaintiff Danielle Thys

Plaintiff Thys signed a sales contract to purchase a vehicle from Defendant which contained an arbitration provision. Ahluwalia Decl. ¶ 8, 14. On the second to last page of the agreement, Thys signed under bolded and capitalized text agreeing to the terms of the contract, confirming signature, and that all pages were read. Ahluwalia Decl. Ex. A at 6. As Thys signed on each page, including the page with the arbitration provision, mutual assent is established. *See Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001) (reasoning that "one who signs an instrument which on its face is a contract is deemed to assent to all its terms."). Of note, Thys raises no claims of unconscionability regarding the sales contract.

### 2. Plaintiff Levi Stoffal

Plaintiff Stoffal entered into an Order Agreement with Defendant which contained an arbitration provision. Ahluwalia Decl. Ex. C at 4, ECF No. 75-4. Subsequently, Stoffal signed a contract to lease a vehicle from Defendant which also contained an arbitration provision. Ahluwalia Decl. Ex. D at 3, ECF No. 75-5. Oregon courts have deemed that "[a]nything that

8

1  amounts to a manifestation of a formed determination to accept the offer, communicated to the
2  party [that] making such offer" completes the contract. *Ken Hood Const. Co. v. Pac. Coast*
3  *Const., Inc.*, 201 Or. App. 568, 579 (2005). In addition, Stoffal did not opt out of the arbitration
4  agreement. Castaneda Decl. ¶ 6. The agreement permitted an opt out within 30 days after signing.
5  Castaneda Decl. ¶ 5. The Ninth Circuit explains that parties are bound to contracts when given a
6  fair and meaningful opportunity to opt out. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201,
7  1210 (9th Cir. 2016) (holding that "if there is an opportunity to opt out, the arbitration agreement
8  is not adhesive, and thus not procedurally unconscionable.") (citations and internal quotation
9  marks omitted).

### 3. Plaintiff Cary Phillips

Rather than signing an agreement, Plaintiff Phillips placed an order to purchase a vehicle online, and upon clicking the "Place Order" button agreed to the arbitration agreements provided through direct hyperlinks. Sinha Decl. ¶ 5. Defendant explains that the text of the agreement was located next to the "Place Order" button, which states "[b]y placing this order, I agree to the Model Y Order Agreement, Terms of Use, and Privacy Notice." Sinha Decl. ¶¶ 5-6. Phillips disputes assent in this transaction, noting the arbitration clause was not signed, but rather, "clickwrap[ped]" and did not provide inquiry notice. Opp'n 9. Plaintiff, however, misunderstands the standard.

"[T]he Ninth Circuit clearly has recognized that while the FAA requires a writing, it does not require that the writing be signed by the parties." *Batory v. Sears, Roebuck & Co.*, 124 F. App'x 530, 533 (9th Cir. 2005) (*quoting Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1439 (9th Cir. 1994). For example, in *Cordas v. Uber Techs., Inc.*, the plaintiff argued that he had not assented to Uber's terms and conditions because it was a "browsewrap" agreement. 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017). By creating an Uber account, the court found that plaintiff was provided with the requisite notice because he was presented with language stating that "[b]y creating an Uber account, you agree to the Terms & Conditions and Privacy Policy" and he clicked "DONE" to complete setting up his account. *See id.* In other words, the plaintiff did not assent to the terms and conditions by passively viewing a screen. *See id.* Rather, the plaintiff was required to

affirmatively assent to the agreement by clicking "DONE" to complete the process of the transaction because without doing so the user could not create an account. *See id.* By creating the account, the Court noted that the plaintiff "affirmatively acknowledged the agreement" and was bound by its terms. *See id.*

The same is true of Phillips. When purchasing a vehicle from Defendant, Phillips was required to click a "Place Order" button accompanied by language that stated "[b]y placing this order, I agree to the Model Y Order Agreement." Arb. Mot. 9; Sinha Decl. ¶¶ 5, 9. As the agreement directly hyperlinked Plaintiff to an online copy of the arbitration provision, and since Plaintiff could not purchase the vehicle without clicking "Place Order", it is evident that Phillips affirmatively acknowledged and assented to the agreement. *Id.* Phillips also did not opt out of the agreement. Castaneda Decl. ¶ 6. Phillips was given a fair and meaningful opportunity to opt out, and thus, the arbitration agreement is not adhesive. *See Mohamed*, 848 F.3d at 1210) (an arbitration agreement is not adhesive if there is an opportunity to opt out).

Given the foregoing, the Court finds that Plaintiffs assented to the arbitration agreements.

### B. Plaintiffs Agreed to Delegate their Disputes to an Arbitrator.

A delegation provision is an agreement to arbitrate "threshold issues" or gateway questions concerning the arbitration agreement. *Rent-A-Ctr., W., Inc.*, 561 U.S. at 69. Although courts generally resolve gateway questions of arbitrability, "such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy," the parties may also delegate the adjudication of arbitrability issues to an arbitrator. *See id.* If gateway issues are delegated to an arbitrator, the court must enforce that antecedent agreement only when there is clear and unmistakable evidence of consent to the delegation clause itself. *See Henry Schein, Inc.*, 139 S. Ct. at 524; *see also First Options of Chi.*, 514 U.S. at 944. Whenever contracting parties delegate the question of arbitrability to an arbitrator, courts typically enforce the agreement as written. *See Henry Schein, Inc.*, 139 S. Ct. at 526 ("[A] court may not override the contract, even if the court thinks that the arbitrability claim is wholly groundless.")

As discussed above, the parties entered agreements that contained arbitration provisions. Thys' agreement states that "[a]ny claim or dispute . . . including the interpretation and scope of

this [a]rbitration [p]rovision, and the arbitrability of the claim or dispute. . . ." shall be resolved by binding arbitration. Ahluwalia Decl. Ex. A at 7. The statement is clear and unmistakable. The express language indicates that the Thys assented to the delegation of arbitrability.

Phillips and Stoffal's agreements state that "any dispute arising out of or relating to any aspect of the relationship between you and [Defendant] will not be decided . . . by a single arbitrator in an arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules." Ahluwalia Decl. Ex. B at 3; Ahluwalia Decl. Ex. D at 3. The Ninth Circuit has observed "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitute clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074 (9th Cir.2013). Accordingly, Defendant has met its burden of proving that Plaintiffs entered into agreements to arbitrate and presents clear and unmistakable evidence that the parties delegated arbitrability to an arbitrator.

### C. Plaintiffs' Arbitration Agreements Encompass their Causes of Action.

#### 1. Plaintiffs Challenge the Existence of their Agreements.

The Court turns next to whether Plaintiffs' agreements encompass the dispute at issue. *See Lifescan*, *Inc.*, 363 F.3d at 1010. Defendant argues that, at this juncture, the Court need only confirm that Plaintiffs agreed to delegate arbitrability. Arb. Mot. 8-10. Conversely, Plaintiffs contend that their antitrust claims do not arise out of the contract containing the arbitration agreement, but instead are related to a subsequent and separate, independent transaction. Opp'n 1, 6-9.

The Ninth Circuit explains that, where the arbitrability of a dispute is contested, courts must decide "whether the parties are contesting the *existence* or the *scope* of an arbitration agreement." *Goldman, Sachs & Co.*, 747 F.3d at 742 (emphasis in original). "A party can be forced to arbitrate only those issues it has specifically agreed to submit to arbitration . . ." *First Options of Chi., Inc.*, 514 U.S. at 945. In the face of any ambiguity, "under the federal presumption in favor of arbitration, an arbitrator would have jurisdiction to arbitrate claims." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1285 (9th Cir. 2009). Nevertheless, the

11

presumption in favor of arbitrability does not apply when the parties contest the existence of an arbitration agreement. *Goldman, Sachs & Co.*, 747 F.3d at 742.

In *Johnson v. Walmart Inc.*, the plaintiff purchased a set of tires online from Walmart.com. *Johnson*, 57 F.4th at 679. Upon finalizing the transaction, he agreed to the Walmart.com Terms of Use. *Id.* The agreement contained an arbitration provision requiring "all disputes arising out of or related to the Terms of Use . . . be resolved through final and binding arbitration." *Id.* (internal quotation marks omitted). After receiving the tires by mail, the plaintiff had them installed at a Walmart Auto Care Center and, while waiting, purchased a lifetime service agreement from Walmart at a separate, additional cost. *Id.* at 680. When he was later denied service, the plaintiff filed a putative class action and Walmart moved to compel arbitration. *Id.* Walmart argued that the plaintiff agreed to arbitrate when he purchased tires from Walmart.com and agreed to the Terms of Use which extended to his in-store purchase. *Id.* The plaintiff contended the agreement did not encompass the service agreement and the Ninth Circuit agreed, determining that the plaintiff contested the existence, not the scope, of an arbitration agreement covering the dispute. *Id.* at 681, 683.

Here, Plaintiffs similarly contest the existence, not the scope of their agreement with Defendant. They claim the purchase or lease of their EVs represented one transaction and the purchase of subsequent repair services, maintenance, or compatible parts replacement was a separate, independent transaction. Opp'n at 1, 6-9. As a result, Plaintiffs assert that they are not bound to the arbitration provision in their purchase or lease agreements because their injuries are wholly related to the second transaction. *Id.* Therefore, the presumption in favor of arbitration is inapplicable and the Court must interpret the terms of Defendant's agreements with Plaintiffs.

**2.      Plaintiffs' Arbitration Agreements Apply to their Antitrust Claims.**

In California and Oregon, a contract must be interpreted to give effect to "the mutual intention" of the parties as it existed at the time of contract formation. Cal. Civ. Code. § 1636; Or. Rev. Stat. Ann. § 42.240. "To determine the reach of a particular agreement, we must look to its express terms." *Walsh v. Arizona Logistics, Inc.*, 998 F.3d 393, 396 (9th Cir. 2021)). California and Oregon courts analyze the words of a contract, given their usual and ordinary meaning in

12

1 connection with the rest of the agreement.  *See Valencia v. Smyth*, 185 Cal. App. 4th 153, 176

2 (2010); *see also Yogman v. Parrott*, 325 Or. 358, 361 (1997).  Similarly, both states interpret the

3 words of the contract "as a whole."  *See Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d

4 1038, 1042 (9th Cir. 2020); *see also Slocum v. Lang*, 132 Or. App. 571, 576 (1995).

### a. Plaintiff Danielle Thys

Defendant's arbitration provision in Plaintiff Thys' agreement states:

> Any claim or dispute, whether in contract, tort, statute or otherwise *(including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute)*, between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action.

Ahluwalia Decl. Ex. A at 7 (emphasis in original).  The relevant words of the provision are "any claim or dispute . . . between you and us . . . which arises out of or relates to your . . . purchase or condition of this vehicle. . . ."  *Id.*; Arb. Mot. 4.  As a preliminary matter, Thys' "claim or dispute" is that she was required to "pay supracompetitive prices and suffered exorbitant wait times to maintain and repair their Tesla vehicles."  Am. Compl. ¶ 1.  "[Y]ou and us" references Defendant as the seller and Thys as the purchaser of the vehicle subject to agreement.  The question concerns whether "condition of this vehicle" pertains only to the purchase, or alternatively, if it extends to post-purchase services related to the vehicle.

The plain meaning of "condition of this vehicle" tends to relate to functionality, aesthetic, or operability of the vehicle.  By definition, "condition", in the context of purchasing a vehicle, means "the state of something with regard to its appearance, quality, or working order."  *Condition*, OXFORDDICTIONARIES.COM (Sept. 14, 2023), https://premium.oxforddictionaries.com-/definition/english/condition.  Under this definition, maintenance, repair services, and compatible parts replacement are all services that sufficiently relate to the "quality" or "working order" of the vehicle Thys purchased from Defendant.  Those services were not purchased in relation to anything else except the vehicle purchased from Defendant.  Therefore, the arbitration agreement extends to transactions related Thys' claims regarding the upkeep of her vehicle.

13

### b. Plaintiffs Cary Phillips and Levi Stoffal

The relevant words of Defendant's arbitration agreements with Plaintiffs Phillips and Stoffal states that "any dispute arising out of or relating to any *aspect* of the *relationship* between you and [Defendant] will not be decided . . . by a single arbitrator in an arbitration." Ahluwalia Decl. Ex. B at 3; Ahluwalia Decl. Ex. D at 3; *see* Section I.B.2-3 *supra*.

The plain meaning "any aspect" tends to refer to any matter related to the vehicle itself, since it forms the basis of the agreement and is the reason the parties are contracting. Specifically, "aspect" means "a particular part or feature of a situation, an idea, [or] a problem." *Aspect*, OXFORDDICTIONARIES.COM (Sept. 14, 2023), https://premium.oxforddictionaries.com/-definition/english/aspect. Under this definition, the maintenance, repair services, and compatible parts replacement are all services that relate to the purchase of the vehicle. The vehicle itself is the object or "particular part" of the agreements formed amongst the parties.

The plain meaning of "relationship" tends to explain how one party is associated with the other party in forming the agreement. "Relationship" means "[t]he way in which two or more people or things are connected, or the state of being connected. *Relationship*, OXFORDDICTIONARIES.COM (Sept. 14, 2023), https://premium.oxforddictionaries.com/definition/-english/relationship. Under this definition, Defendant and Plaintiffs are "connected" by contract for the purchase or lease of their vehicles. Defendant is the seller and Plaintiffs are the purchaser and lessor. Therefore, the arbitration agreement extends to transactions related to Phillips and Stoffals claims regarding the upkeep of their vehicles.

### c. Plaintiffs' Agreements Extend to their Subsequent Agreements.

In sum, the arbitration provision extends to Plaintiffs' antitrust claims, which concern the repair, maintenance, and replacement of parts in their vehicles. Am. Compl. ¶ 1. As interpreted, the arbitration agreement covers the *condition* or working order of the vehicle. In addition, the arbitration agreement covers any *aspect* of the *relationship*. Said differently, the arbitration agreement applies directly to Plaintiffs' claims because they raise disputes regarding the condition of the vehicles which connect the parties, and the dispute is about repairing or maintaining those vehicles. As a result, the arbitration agreement extends to subsequent transactions between

Plaintiffs and Defendant concerning services related to the maintenance, repair, or replacement parts of their vehicles.

### 3. Plaintiffs' Separate Transactions are Interrelated, Thus the Arbitration Clause Applies.

Plaintiffs' final argument is that they are not bound by the arbitration agreements because the purchase or lease of the vehicles is a separate and independent transaction from their purchase of parts and services because the agreements required separate negotiation, separate mutual assent, and separate consideration. *See* Opp'n 7-8. As such, the arbitration agreements in the sale or lease agreements do not extend to their subsequent service agreements. *Id.* The Court disagrees. Although Plaintiffs' transactions were separate, they were not independent. Plaintiffs' separate transactions are interrelated in an ongoing series of transactions. Thus, the arbitration clause applies.

To determine the connection between two transactions, the Ninth Circuit advises that courts apply the interrelatedness test. Where the first of two contracts are a "discrete agreement, the lack of an arbitration clause means disputes over the agreement are not subject to arbitration." *Johnson*, 57 F.4th at 682-83 (*quoting Archexpo*, 68 F.3d at 340). "But where two contracts are merely interrelated contracts in an ongoing series of transactions, an arbitration provision in one contract could apply to subsequent contracts." *See id*. Courts must consider whether the arbitration clause in the first agreement controls the separate agreements of the parties. *See Archexpo*, 68 F.3d at 340. In Johnson, the Ninth Circuit has considered such factors as whether the agreements (1) were separate and independent of one another, (2) differed substantially, and (3) contain the proof necessary to establish arbitration claims under the second agreement are sufficiently related to the dispute under the first agreement. *Johnson*, 57 F.4th at 683 (*citing Archexpo*, 68 F.3d at 340).

In *Archexpo*, the plaintiff organized tours and informational visits in Russia under two divisions: the "Citizen Ambassador Program ('CAP'), and "State Leadership Initiative ('SLI')." *Archexpo*, 68 F.3d at 338. The defendant facilitated the tours organized by the plaintiff. *Id*. at 338-39. The parties entered two agreements: the first between CAP and the defendant to perform

15

services a tour for non-state officials; and the second between SLI and the defendant for a tour by a state delegation. *Id.* at 339. Following the first agreement with CAP, a dispute arose about performance in the first agreement, which led to the cancellation of the second agreement. *Id.* The plaintiff filed a complaint in federal court and the defendant moved for arbitration in Moscow, Russia. *Id.* Both were awarded judgements and in assessing which judgement to enforce the Ninth Circuit analyzed the interrelatedness of the contracts. *Id.* at 339-40.

The Ninth Circuit explained that the CAP and SLI agreements were separate and independent because they concerned two "separate tour types" and two "completely different groups of tourists." *Archexpo*, 68 F.3d at 340. The court also determined that the SLI agreement contained no arbitration clause, indicating an intention to treat it differently. *Id.* Finally, the court held that the two agreements were not interrelated stating that, "the proof necessary to establish [the defendant's] Moscow arbitration claims under the [SLI] agreement has nothing to do with the dispute under the [CAP] agreement." *Id.* These factors together were substantial evidence the agreements were independent and separate of one another. *Id.*

The Ninth Circuit applied the same logic in *Johnson*. 57 F.4th at 682-83. The plaintiffs' service agreement was "negotiated and entered into separately" from the agreement to purchase tires. *Id.* at 683. The contracts involved separate consideration because the first was for the sale goods related to the online purchase and the second was for performance of services related to the in-person purchase and unrelated to Walmart.com's Terms of Use. *Id.* The proof needed to bring the breach of contract claim rested entirely on the second agreement to purchase tires—the plaintiff would have brought the claim against Walmart "whether he purchased the tires from Walmart or another retailer." *Id.* Together, these factors amounted to substantial evidence.

The facts here are distinguishable from *Archexpo* and *Johnson* because the arbitration clause in the purchase or lease agreement controls the second agreement for services and parts. It is true, as Plaintiffs contend, that the first and second agreements between the parties were separate; however, they were not independent of one another. Opp'n 6-7. In *Archexpo*, the agreements were separate and independent because they concerned two different tour types and groups of customers. *Archexpo*, 68 F.3d at 340. In *Johnson*, the agreements were separate and

16

1   independent because the arbitration agreement under Walmart.com's Terms of Use for the

2   purchase of tires did not extend to the plaintiffs' purchase of services for the tires under the first

3   agreement. *Johnson*, 57 F.4th at 683.

4         Here, like *Archexpo* and *Johnson*, the agreements are separate because they concern

5   different purchased items—the vehicles purchased are goods while the repair and maintenance

6   transactions are services. But unlike *Archexpo*, the separate agreements are not independent

7   because the purchases concern the same customers and are services for the vehicles purchased. In

8   other words, Plaintiffs' transactions for their vehicles and the subsequent purchase of maintenance

9   related services are an ongoing series of transactions related to conditioning their vehicles. The

10  transactions for services are dependent on owning or leasing the EVs in the first place. Unlike

11  *Johnson*, the arbitration clause in the transactions to purchase or lease Plaintiffs' vehicles extends

12  to their subsequent purchase of services for those same vehicles.

13        In addition, the first of two agreements in both *Archexpo* and *Johnson* were discrete and

14  differed substantially because the second agreement contained no arbitration clause, meaning the

15  parties intended to treat the second transaction differently. Here, as discussed above, the parties

16  mutually assented to arbitrate issues about Plaintiffs' vehicles evidenced by the arbitration

17  provisions that extend to "the condition of the vehicle" or "all aspects of the relationship" between

18  the parties. In other words, the first agreement applies to the subsequent servicing of Plaintiffs'

19  vehicles. Although the second transaction lacks an arbitration clause, the Court has established the

20  first agreement extends to the second agreement by contract interpretation.

21        Finally, Defendant provides the proof necessary to establish arbitration claims under the

22  second agreement are sufficiently related to the dispute under the first agreement. In both

23  *Archexpo* and *Johnson*, the proof needed to bring those plaintiffs' claims for breach of contract

24  required that one contract relate or extend to the other agreement. *Archexpo*, 68 F.3d at 340;

25  *Johnson*, 57 F.4th at 683. Here, the same barrier does not exist because Plaintiffs' purchase or

26  lease of their vehicles *does* extend to the repair and maintenance of their vehicles. Plaintiffs

27  causes of action relate to "pay[ing] supracompetitive prices and suffer[ing] exorbitant wait times to

28  maintain and repair their Tesla vehicles." Am. Compl. ¶ 1. The proof is the recognized relation

1 between the first and second contracts between Plaintiffs and Defendant as interpreted by this
2 Court. No dispute about anti-competitiveness in the Tesla repair or services aftermarkets would
3 exist as asserted unless Plaintiffs contracted for vehicles from Defendant. This is distinct from
4 *Johnson*, where the plaintiff would have brought his claim for breach of contract with the same
5 evidence and arguments regardless of whether he bought the tires from Walmart or not. *Johnson*,
6 57 F.4th at 683. As a result, Plaintiffs' arguments fall short of the evidence required to
7 substantially prove that the agreements are independent. Accordingly, Plaintiffs' separate
8 transactions were not independent. Therefore, the arbitration provisions in the first agreements
9 apply to the second agreements. In other words, the first agreements control the subsequent
10 agreements which are the basis for Plaintiffs' antitrust claims. Thus, the arbitration clause is valid
11 and will be enforced by the Court.

## V. CONCLUSION

The Court finds that (1) Plaintiffs agreed to arbitrate their disputes when purchasing and leasing vehicles from Defendant; (2) Plaintiffs agreed to delegate their disputes to an arbitrator; and (3) Plaintiffs' arbitration agreements encompass their antitrust claims.

For the foregoing reasons, Defendant's motion to compel arbitration against Plaintiffs Danielle Thys, Cary Phillips, and Levi Stoffal is **GRANTED**. This action is stayed pending arbitration proceedings of these plaintiffs' claims only. The parties are **ORDERED** to file a joint statement regarding the status of Plaintiffs Thys, Phillips, and Stoffal's claims within seven (7) days of the conclusion of the arbitration proceedings. This resolves docket nos. 75 and 94.

**IT IS SO ORDERED.**

Dated: September 26, 2023

TRINA L. THOMPSON
United States District Judge

18